**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 15a0398n.06

No. 14-3831

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jun 02, 2015
DEBORAH S. HUNT, Clerk

MARTIN RUBEN GONZALEZ MENDEZ,       )
                                    )
     **Petitioner,**                )
                                    )
v.                                  )
                                    )
LORETTA E. LYNCH, Attorney General, )
                                    )
     **Respondent.**                )
                                    )

ON PETITION FOR REVIEW
FROM THE UNITED STATES
BOARD OF IMMIGRATION
APPEALS

**OPINION**

**Before: MOORE, SUTTON, and WHITE, Circuit Judges.**

    **KAREN NELSON MOORE, Circuit Judge.**  Martin Ruben Gonzalez Mendez ("Gonzalez"), a native and citizen of Mexico, seeks judicial review of a decision by the Board of Immigration Appeals ("BIA").  The BIA affirmed the decision by an Immigration Judge ("IJ") denying Gonzalez's application for cancellation of removal under 8 U.S.C. § 1229b or voluntary departure under 8 U.S.C. § 1229c.  For the reasons set forth below, we **DISMISS** the petition in part for lack of jurisdiction and **DENY** the remainder of the petition.

**I.  BACKGROUND**

    The Department of Homeland Security began removal proceedings against Gonzalez after he was arrested in 2010 for driving with a suspended license.  Gonzalez was charged with entering the United States without admission or parole.  Gonzalez conceded removability and sought cancellation of removal or voluntary departure.

The IJ held hearings on two separate dates with two different interpreters to assess Gonzalez's petition. Two witnesses testified, Gonzalez (in Spanish) and Penny Burillo (in English). Gonzalez testified that he arrived in the United States in April 2000. 3/7 Hr'g Tr. at 70 (AR 268). He initially testified that his first job was at Burmeister Farms beginning in 2001, but then he later testified that he began working there in 2000 under his cousin's name. *Id.* at 81–86 (AR 279–84). He claimed his three U.S. citizen children would face significant hardship if he were removed to Mexico, explaining that their mother cannot support them because she cannot drive and does not work. *Id.* at 94 (AR 292). Although Gonzalez initially testified that his children would remain in the United States if he were removed because of the violence in Mexico and because he could not obtain work there to support them, he later testified that they "[m]aybe" would stay in the United States. *Id.* at 95, 114 (AR 293, 312). Burillo testified that she met Gonzalez in September 2000 when she was working as a translator for the Michigan Department of Human Services. *Id.* at 17 (AR 215). She explained that one of Gonzalez's roommates at the time died in a car accident, and she met Gonzalez when she went to his residence to obtain help in completing the necessary paperwork for transporting the deceased back to Mexico. *Id.* at 17–18 (AR 215–16). Burillo also testified that she knew Gonzalez because they attend the same church. *Id.* at 22 (AR 220).

On October 2, 2012, the IJ denied Gonzalez's requests for cancellation of removal or voluntary departure. IJ Decision at 41 (AR 107). The IJ found that neither Burillo nor Gonzalez was credible. *Id.* at 12, 40 (AR 78, 106). The IJ noted several inconsistencies between Burillo's

2

and Gonzalez's testimony or application, including that the address Burillo gave for where Gonzalez was living when she first met him, 96 Ferry Street, was not listed on his application, and that she thought his current address was 62 Elliott Street, when in fact he had listed his address as 62 Ellis Street. *Id.* at 13–14 (AR 79–80). As for Gonzalez, the IJ focused on multiple inconsistencies between Gonzalez's application and Gonzalez's testimony at the hearing, as well as documentary evidence he submitted, including that Gonzalez's father filed a visa petition on his behalf stating that Gonzalez had arrived in the United States in 1997; that the dates during which Gonzalez testified he lived at various addresses were inconsistent with his application, and that his only explanation for failing to list the 96 Ferry Street address on his application was that he forgot to include it; that Gonzalez first denied working at Burmeister Farms prior to 2001 and then testified later that he started working there in 2000; that Gonzalez did not list any aliases in his application, but then testified at his hearing that he had worked at Burmeister Farms in 2000 under his cousin's name; that Gonzalez first testified that his cousin's name was Roberto, but, after the W-2s for this period of employment Gonzalez produced at the second hearing listed his cousin's name as Norberto, changed his testimony to say his cousin's name was Norberto; and that Gonzalez included only farm jobs on his application but then testified at his hearing that he had also worked in a grocery store for eleven years. *Id.* at 20–26, 34–35, 39–40 (AR 86–92, 100–01, 105–06). The IJ further emphasized that Gonzalez spelled Burillo's name as Murillo, despite testifying that he had known her since 2000. *Id.* at 28 (AR 94). Finally, the IJ noted that one of the earning statements submitted by Gonzalez listed an address that was not included in

3

his application and was in an entirely different town than the rest of the other addresses he had listed. *Id.* at 32 (AR 98).

As a result of these adverse-credibility findings, the IJ found that Gonzalez had not demonstrated continuous presence in the United States for at least 10 years, and instead suggested that Gonzalez likely arrived in 2001 or 2002. *Id.* at 39–40 (AR 105–06). The IJ also found that Gonzalez had "not demonstrated the requisite degree of hardship to his children, and that they would, in fact, go back with him to Mexico because his wife is here illegally." *Id.* at 38 (AR 104). The IJ explained that Gonzalez had not demonstrated that he could not get a job in Mexico, that his children speak Spanish and are in good health, and that Burillo had testified that the children could attend school through high school in Mexico. *Id.* at 38–39 (AR 104–05). Finally, the IJ found that Gonzalez had not demonstrated good moral character because he had "quite clearly prevaricated in his testimony about working under Roberto's name . . . and never working at Burmeister Farms prior to the year 2001." *Id.* at 40 (AR 106).

The IJ also denied Gonzalez voluntary departure. *Id.* at 41 (AR 107). The IJ found that because "he prevaricated to the Court intentionally about working at Burmeister Farms under the name Roberto," he cannot demonstrate the statutorily required good moral character. *Id.*

The BIA affirmed the IJ. The BIA found that the IJ's adverse credibility determinations were not clearly erroneous. BIA Decision at 2 (AR 4). Although the BIA acknowledged that Gonzalez might have innocently forgotten to include all of the places he lived given the many times he had moved, the BIA emphasized that Gonzalez's "errors are much more substantial"

4

than that, and listed many of the same inconsistencies highlighted by the IJ. *Id*. at 1–2 (AR 3–4). The BIA found that Gonzalez's children would not face "significantly greater" hardship because his children do not have any serious health problems and they are doing well in school. *Id.* at 2 (AR 4). And the BIA determined that the IJ appropriately denied voluntary departure because "[t]he record shows the respondent and his witness were not entirely truthful with the court." *Id.*

Further, the BIA held that there was "no merit" to Gonzalez's argument that interpretation problems deprived him of due process. *Id.* The BIA found that its "review of the record reveal[ed] only minor problems that were quickly clarified." *Id.* Further, the BIA found "no prejudice to the respondent from any minor errors" because a "large number of [the] inconsistencies . . . [were] unrelated to any problems with the translation." *Id.* After raising the possibility of translation problems at the end of the second hearing, the BIA noted that Gonzalez's counsel stated "that the problems were clarified." *Id.* The BIA also emphasized that the IJ "reviewed the translation and issued an interim order finding no corrective action was needed." *Id.*

Gonzalez raises two claims in his petition for review. First, he argues that he was deprived of due process in his hearing due to translation problems that affected the IJ's adverse-credibility finding, and second, he argues that the IJ erred as a matter of law in denying him cancellation of removal and voluntary departure.

## II. ANALYSIS

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id.* We review the factual findings of both decisions to determine whether they are supported by substantial evidence, and we cannot reverse unless the evidence is "so compelling that no reasonable factfinder could fail" to conclude to the contrary. *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005) (internal quotation marks omitted). We review legal conclusions do novo. *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005).

A petitioner must satisfy four requirements to be eligible for cancellation of removal: "(1) continuous physical presence for at least ten years; (2) good moral character; (3) not having been convicted of certain crimes; and (4) that the removal would result in 'exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.'" *Montanez-Gonzalez v. Holder*, 780 F.3d 720, 722 (6th Cir. 2015) (quoting 8 U.S.C. § 1229b(b)(1)). However, the ultimate decision of whether to grant cancellation of removal is discretionary. *Id.* The decision whether to grant voluntary departure is also discretionary. *Harchenko v. I.N.S.*, 379 F.3d 405, 411 (6th Cir. 2004).

Under the Immigration and Nationality Act, we cannot review denials of discretionary decisions. 8 U.S.C. § 1252(a)(2)(B)(i). However, there is an exception for "review of constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). We have held that "questions of law" include claims that require "resolution of a contested interpretation of language in the statute or the regulations" and "claims that require an evaluation of whether the BIA adhered to legal standards or rules of decision articulated in its published precedent." *Ettienne v. Holder*, 659 F.3d 513, 517 (6th Cir. 2011). "In contrast, this court lacks jurisdiction over claims that can be evaluated only by engaging in head-to-head comparisons between the facts of the petitioner's case and those of precedential decisions," or claims that are essentially "objections to the agency's weighing of the facts." *Id.* at 518–19.

We lack jurisdiction to review Gonzalez's second argument. Gonzalez argues that "the BIA erred as a matter of law" in finding that he had not established the requisite 10 years in the United States, erred in finding that he lacked good moral character because "[t]he record does not include any evidence of bad moral character," and that "[t]he hardship factors were not adequately considered in this case." Pet. Br. at 21–22. Gonzalez does not argue that the BIA applied the incorrect standard for evaluating his cancellation of removal claim or identify any precedential rule of decision it failed to follow. Instead, his claim is essentially that the BIA did not properly weigh the evidence in his case. Accordingly, we must dismiss this aspect of Gonzalez's petition for lack of jurisdiction.

If we construe Gonzalez's petition as raising the legal claim that substantial evidence did not demonstrate his ineligibility for cancellation of removal, we would have jurisdiction to review such a claim. *See Johns v. Holder*, 678 F.3d 404, 407 (6th Cir. 2012). However, we would have to accept the BIA's weight-of-the-evidence and credibility determinations. *Id.*; 8 U.S.C. § 1229b(b)(2)(D). The BIA's decision that Gonzalez was ineligible for cancellation of removal is supported by substantial evidence. To demonstrate his eligibility for cancellation of removal, Gonzalez had to prove his continuous physical presence in the United States for the 10 years preceding receipt of his Notice to Appear. 8 U.S.C. § 1229a(c)(4)(A)(i). But the IJ rejected all his evidence to that effect as not credible, and the BIA accepted the IJ's credibility determination. BIA Decision at 2 (AR 4); IJ Decision at 12, 34, 39–40 (AR 78, 100, 105–06). That leaves Gonzalez with "no cogent proof that [he] had been here for the 10 years," IJ Decision at 40 (AR 106), precluding cancellation of removal. *See* 8 U.S.C. § 1229b(b)(1).

We have jurisdiction over Gonzalez's due process claim. We have held that petitioners can be deprived of due process in removal proceedings as a result of incompetent interpreters. *Amadou v. INS*, 226 F.3d 724, 726–28 (6th Cir. 2000). However, to prevail on such a claim, the petitioner "must show error and substantial prejudice," which "is essentially a demonstration that the alleged violation affected the outcome of the proceedings." *Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005). In other words, the translation problems identified by Gonzalez must relate to "[t]he factors cited by the immigration judge in support of his credibility conclusions."

*Id.* We also have declined to find due process violations where the IJ was not "on notice that there were problems with the interpreters." *Id.* at 978.

Gonzalez has not shown that any interpretation problems in his hearing rose to the level of a due process violation. The IJ was on notice of interpretation problems in the second hearing because Gonzalez's counsel raised his concerns about the interpreter before closing arguments. 3/12 Hr'g Tr. at 204 (AR 403). However, we note that some of the passages quoted by Gonzalez in his petition occurred during the first hearing, about which Gonzalez never raised any translation concerns before the IJ. Pet. Br. at 15–16. Moreover, even assuming errors occurred, Gonzalez has not shown that he suffered substantial prejudice as a result. First, after raising the possibility of translation problems at the end of the second hearing, Gonzalez's counsel answered the IJ's question whether "there's something you want to go back and redo?" by responding "No, I think it's been clarified." 3/12 Hr'g Tr. at 208 (AR 407). The IJ further asked "You think that ultimately we got the right answer?" *Id.* Gonzalez's counsel replied "I believe so ultimately," and raised only general concerns about "inferences maybe as far as truthfulness if something was misunderstood," but did not raise any more specific concerns. *Id.* Second, the IJ had the transcript evaluated by a third party, and determined that "no corrective action [was] needed." IJ Order (AR 559). Finally, the passages quoted by Gonzalez as demonstrating translation problems do not relate to the primary reasons the IJ gave for questioning Gonzalez's credibility, most significantly that Gonzalez had not disclosed that he worked under his cousin's name on his application, misstated his cousin's name as Roberto multiple times in the hearing, and gave

inconsistent testimony about whether he started working at Burmeister Farms in 2000 or 2001.[1]

Pet. Br. at 13–15; IJ Decision at 39–40 (AR 105–06). The one potential exception—whether Gonzalez consistently said Roberto instead of Norberto—is not accurately characterized as a translation problem, even though Gonzalez includes this "simple mispronunciation" as he terms it in this section of his petition. Pet. Br. at 17. Moreover, the IJ listened to the hearing recording again to confirm that Gonzalez actually said Roberto, not Norberto. IJ Decision at 25, 36 (AR 91, 102). Finally, Gonzalez appears to acknowledge the lack of direct prejudice in his brief, stating that although the interpretation problems "may not have affected the overall determination as to Petitioner's credibility in the eyes of the IJ and the BIA, they clearly did affect the overall theme and feeling of the testimony." Pet. Br. at 15. In sum, even if minor translation errors occurred, Gonzalez did not suffer prejudice as a result.

As for voluntary departure, the IJ found that Gonzalez had "intentionally been untruthful" during the hearing and thus could not "demonstrate the requisite degree of good moral character" required to qualify for that benefit. IJ Decision at 40–41 (AR 106–07); *see* 8 U.S.C. § 1229c(b)(1)(B); *Matter of Barcenas*, 19 I. & N. Dec. 609, 612 (BIA 1988). The numerous inconsistencies in Gonzalez's testimony provide substantial evidence to support the BIA's affirmance of the IJ's ruling.

---

[1]Gonzalez also includes arguments in this section of his petition about Burillo's testimony. Pet. Br. at 16. However, as Burillo testified in English, these arguments do not relate to any translation problems.

## III.  CONCLUSION

For the reasons set forth above, we **DISMISS** the petition in part for lack of jurisdiction and **DENY** the remainder of the petition.